

FILED

MAR 01 2017

CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| KAREN B. REINHARDT, | 4:16-CV-04009-RAL |
| Plaintiff, | |
| vs. | OPINION AND ORDER AFFIRMING DECISION OF COMMISSIONER |
| NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff Karen B. Reinhardt (Reinhardt), who formerly was known as Karen Ford,[1] seeks reversal of the decision of the Commissioner of Social Security (Commissioner) denying her claim for supplemental security income (SSI). This is a case where a decision whether Reinhardt is disabled due to mental health issues is a close call, but the ALJ's decision must be affirmed under the deferential "substantial evidence in the record as a whole" standard. For the reasons explained below, this Court affirms the Commissioner's decision.

## I.   Procedural History

Reinhardt applied for SSI benefits on August 16, 2012. AR[2] 191–97. Reinhardt initially alleged that her disability preventing her from gainful employment began on May 15, 1995. AR 191. Information collected by the Commissioner, however, showed that Reinhardt had income as reported on W-2 forms in 1998, 1999, 2000, 2004, 2005, 2006, 2007, and 2011. AR 201–06. In addition,

---

[1] Throughout the proceedings before the Commissioner, Plaintiff used the name Karen B. Ford. She subsequently has changed her last name back to her maiden name of Reinhardt.

[2] This Opinion and Order uses "AR" to refer to the Administrative Record, followed by the relevant page numbers therein.

1

between May of 1995 and June of 2004, Reinhardt also was self-employed doing daycare and earning on average $7,000 per year, while raising her own children. AR 231. At the evidentiary hearing before Administrative Law Judge Eskunder Boyd (the ALJ), Reinhardt took the position that she had engaged in no substantial gainful activity since July 31, 2012, instead of the earlier date in 1995. AR 35.

Reinhardt in proceedings before the Commissioner alleged disabilities for both physical and mental health conditions, including the following:

> Panic Attacks and Major Depression, PTSD from abuse, Attention Deficit Disorder, High Cholesterol, Bipolar Disorder, Chronic Insomnia, Mitral Valve Prolapse, Sciatic Nerve Problems, Hearing Loss, Cataracts, Glaucoma, Irritable Bowel Syndrome, Hietal (sic) Hernia, Ulcers, Heart Burn, Chronic Pain, Epidural Injections, Edema, Fibromyalgia, Osteoarthritis, Bersitis (sic), Ankle Pain, Tendonitis, Dislocated left and right knees and surgery, Carpal Tunnel (need surgery and have had on right hand), Degenerative Disc Disease, Scoliosis, No Curve in Neck.

AR 91–92. Various function reports completed by Reinhardt, if believed, indicate that she often is bedridden, seemingly in need of daily home medical care given the extent of her claimed limitations and problems. AR 248–55; AR 264–71; AR 274–81; AR 282–88.

The Commissioner collected and considered treatment records and had Reinhardt undergo physical and mental health evaluations, as well as having a Residual Functional Capacity (RFC) Assessment and a Mental RFC Assessment done. AR 91–95; AR 97–102; AR 367–72. The Commissioner denied the claim initially. AR 124–26. Reinhardt sought reconsideration. AR 127–28. The Commissioner had a second evaluation of Reinhardt's RFC and Mental RFC done. AR 116–18; AR 118–19. The Commissioner then determined that the previous denial of the claim was proper under the law. AR 130–36.

Reinhardt was tardy in filing her request for hearing, but the Commissioner granted such a hearing. AR 137–41; AR 142–48; AR 151–82; AR 185–90. The ALJ conducted an evidentiary hearing on June 12, 2014. AR 29–69. The ALJ then released his decision and notice, from which Reinhardt now appeals. AR 8–24.

2

## II.    Factual Background

### A. Reinhardt's Relevant Personal History

Reinhardt was born in February of 1958, and thus was 54 at the time she ultimately claimed to have been last able to engage in substantial gainful activity, and was 56 at the time of the hearing. AR 38; see AR 36. Reinhardt originally is from Michigan, graduated from high school in 1976, and worked as a machinist and welder from 1979 until 1995. AR 294. Reinhardt has two years of college and some computer training. AR 230. Reinhardt married Mark Ford in 1994, had a son born in 1995 and a daughter born in 1997, and ran an in-home daycare from 1995 until 2005. AR 231; AR 294. Reinhardt and her husband divorced in 2011. AR 295. Reinhardt worked as a telemarketer or in similar jobs for parts of 2004, 2005, 2006, 2007, and 2011. AR 201–06; AR 215–21; AR 231. At the time of the evidentiary hearing, Reinhardt testified that she was 5'1 in height and weighed 210 pounds. AR 38.

Reinhardt has both physical and psychological issues. Although the Court recognizes and considers the interplay between the physical and the psychological issues in Reinhardt's case, it is easier to summarize Reinhardt's treatment history separately for the physical issues and psychological issues.

### B. Reinhardt's Treatment History for Physical Issues

The Administrative Record is devoid of records concerning Reinhardt's treatment history for physical conditions prior to July 12, 2011, AR 403, although there are records as early as September 1, 2009, from counselor Ellen Hohm for psychological issues. AR 333–39. Reinhardt apparently had been prescribed methadone[3] for pain while living in Michigan. At the June 2014 hearing, Reinhardt testified that she had moved from Michigan to Sioux Falls approximately four and a half

---

[3] Methadone is a synthetic narcotic analgesic prescribed for relief of moderate to severe pain. Methadone is a long acting opioid receptor agonist that alters the perception of and response to pain. See Methadone (Oral Route), Mayo Clinic (Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/methadone-oral-route/description/drg-20075806.

years earlier, which would have been around the first of 2010, although some records suggest that she was living in Sioux Falls before then. AR 333–39; AR 387.

The earliest treatment records in the Administrative Record for Reinhardt's physical conditions are from Dr. James M. Barker, a physician with Avera Medical Group. The early treatment records appear to be for methadone refills, rather than evaluations of Reinhardt's overall physical condition. AR 403. Dr. Barker's record from November of 2011 describes that Reinhardt had pain all over and had quit her job. At that point, Dr. Barker suggested that Reinhardt find a new physician because he felt pressure to reduce narcotic prescriptions, while Reinhardt was seeking an increase in those prescriptions. AR 402. Reinhardt continued to see Dr. Barker into 2012. AR 398–400.

On August 15, 2012, Reinhardt sought treatment at Sanford USD Medical Center for right great toe pain, after she had stubbed it and feared that a dirty toothpick was within. She was described as being "in no acute distress." X-rays of the toe were negative and no foreign body was found in it. AR 313–17.

On October 27, 2012, Reinhardt presented to the Avera McKennan Hospital Emergency Room with what was described as a right ankle sprain from having twisted her ankle while walking down some steps. AR 359–60. The initial x-ray showed no fracture or dislocation. AR 360. Reinhardt followed up with the Orthopedic Institute on October 30, 2012, for the right ankle issue. X-rays revealed a possible old fracture in an area that was not causing her discomfort. AR 366. Having the impression that Reinhardt had plantar fasciitis from the injury, a certified nurse practitioner at the Orthopedic Institute placed her in a walking boot. AR 366. According to the medical records, Reinhardt was "insisting on pain pills," and the certified nurse practitioner gave her 20 hydrocodone[4] tablets and a Medrol Dosepak to reduce swelling. AR 366. The next day,

---

[4] Hydrocodone is a narcotic analgesic opioid medication typically used short-term to treat pain because of its addictive qualities. See Hydrocodone and Acetaminophen (Oral Route), Mayo Clinic

November 1, 2012, Reinhardt presented to Dr. Barker and told him that the second x-rays showed a fracture. She received from Dr. Barker a prescription of 50 oxycodone[5] tablets. AR 389. On November 16, 2012, Reinhardt called Dr. Barker asking for a refill of the oxycodone prescription. Dr. Barker also refilled her clonazepam[6] prescription at that time. AR 388.

On November 26, 2012, Dr. Barker authored a medical record because someone had overwritten Reinhardt's clonazepam prescription and the pharmacy had filled Reinhardt's prescription thinking it was for lorazepam.[7] Dr. Barker recorded that both Reinhardt and her husband had accused one another of "misadventures related to narcotics," and both were on methadone at one point. Dr. Barker was concerned about Reinhardt's high dose of methadone and clonazepam, and about the handwritten alteration over his prescription. Dr. Barker had learned through the South Dakota Narcotic website that Reinhardt had also received a hydrocodone prescription from the Orthopedic Institute, and was deeply concerned about her narcotic use. AR 387. At about the same time, on November 23, 2012, Reinhardt returned to the Orthopedic Institute for examination of her right ankle. She was found to be "in no distress," and was referred to physical therapy for instructions on strengthening and rehabilitation. AR 365.

The most thorough record of a physical examination of Reinhardt in the Administrative Record comes from Dr. Mark List of the Center for Family Medicine, who completed a South

---

(Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/hydrocodone-and-acetaminophen-oral-route/description/drg-20074089.

[5] Oxycodone is another narcotic analgesic and opioid for short-term pain relief, which can be highly addictive. See Oxycodone (Oral Route), Mayo Clinic (Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/oxycodone-oral-route/description/drg-20074193.

[6] Clonazepam is a benzodiazepine used to treat certain seizure disorders by slowing down the central nervous system. See Clonazepam (Oral Route), Mayo Clinic (Dec. 1, 2015), http://mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102.

[7] Lorazepam is a benzodiazepine different from clonazepam used to treat anxiety by slowing down the central nervous system. See Lorazepam (Oral Route), Mayo Clinic (Dec. 1, 2015), http://mayoclinic.org/drugs-supplements/lorazepam-oral-route/description/drg-20072296. Lorazepam can be more addictive than clonazepam. See Lance P. Longo & Brian Johnson, Addiction: Part I, Benzodiazepines—Side Effects, Abuse Risk and Alternatives, 61 Am. Fam. Physician 2121 (2000), available at http://www.aafp.org/afp/2000/0401/p2121.html.

Dakota Disability Determination and Evaluation of Reinhardt on November 29, 2012. Dr. List interviewed Reinhardt and summarized her disability claim as "alleged problems with back, neck, knees, ankles, shoulders, elbows, spine from cervical down to lumbar, fibromyalgia, osteoarthritis, problems with edema, problems with panic attacks, depression, PTSD, ADHD and bipolar disease." AR 367. Dr. List talked with Reinhardt about her work history and recorded that she had quit her last job at a call center after two weeks because of having too much pain in her knees. AR 367. Dr. List categorized her complaints into seven areas and noted that she was being evaluated separately for psychiatric complaints. AR 367–68. Dr. List observed that Reinhardt had "mild distress when moving any of her joints or with any palpation of any of her joints or extremities." AR 368. Dr. List's physical examination of Reinhardt was extensive. AR 368–69. Dr. List found Reinhardt's reflexes to be intact, but noted that she had a shuffling gait and was walking with a cane. AR 369. Her right ankle was in a brace from the recent sprain. AR 369. Her neck showed a slight decrease in range of motion, but she had full range of motion of the lumbar spine. AR 369. Reinhardt had some right shoulder range-of-motion loss. AR 369. Reinhardt had good range of motion in her knees, but complained of pain with movement of her knees. AR 369. The x-rays ordered by Dr. List of Reinhardt's back showed degenerative disc disease at T-11 through L-3, with disc space narrowing at L-1-2 and L-2-3. AR 371. The x-ray ordered by Dr. List of Reinhardt's knee showed advanced tricompartment degenerative changes present in her knee. AR 372.

Dr. List's assessment was that Reinhardt would have difficulty lifting or carrying more than 25 pounds occasionally, and would be unable to stand for an eight-hour period, but she could stand for two hours spread out throughout the day. AR 369. Dr. List reasoned that "given that she is seated for the entirety of our hour long exam without problems, I feel like she may be able to do some sedentary work doing some sitting." AR 369–70. Dr. List found no objective findings for any vision or hearing deficits, but did find joint pain and problems with ambulation to be legitimate. AR 370. Dr. List concluded that notwithstanding his physical findings, "I find it very hard to believe that

she would not be able to do a sedentary job where she would be required to sit for the majority of her day and answer a phone or type on a computer or do some sedentary office work." AR 370.

Reinhardt separately had a RFC done by Dr. Kevin Whittle on December 22, 2012. Dr. Whittle believed that Reinhardt could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for two hours in a day, and sit for six hours of an eight-hour day with breaks. AR 97–98. Dr. Whittle based Reinhardt's limitations on her chronic generalized pain syndrome. AR 98. Dr. Whittle believed that Reinhardt's "[s]ymptoms appear to be out of proportion to the objective findings," but acknowledged that PTSD and depression were problems that may have been contributing to her symptoms. AR 99. Dr. Whittle then opined that Reinhardt was not disabled based on her ability to do past relevant work as a telemarketer. AR 101–02.

In March of 2013, Dr. Barker wrote that "it would be difficult for me to justify continued treatment of her chronic pain," due to his concerns about Reinhardt's narcotic use and possible abuse. AR 385. On March 25, 2013, Reinhardt began seeing Dr. Phillip Kelchen of Falls Community Health as her primary medical doctor. AR 423. Dr. Kelchen took a history from Reinhardt and assessed her as having chronic pain, secondary insomnia, and adjustment disorder with depressed mood. AR 423–24. Reinhardt had run out of medications a couple of days before the visit, and Dr. Kelchen discussed with her getting her to be more active "as inactivity is really at the root of her chronic pain and that greater activity will make her feel better in addition to lessening the pain." AR 424. At the next visit on April 1, 2013, Dr. Kelchen prescribed simvastatin,[8] nortriptyline,[9] methadone, omeprazole,[10] and Paxil,[11] together with encouraging walking for exercise. AR 422–23.

[8] Simvastatin is prescribed to treat high cholesterol. See Simvastatin (Oral Route), Mayo Clinic (Dec. 1, 2015), http://mayoclinic.org/drugs-supplements/simvastatin-oral-route/description/drg-20069006.

[9] Nortriptyline is used to treat depression, presumably by increasing serotonin levels in the brain. See Nortriptyline (Oral Route), Mayo Clinic (Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/nortriptyline-oral-route/description/drg-20071998.

[10] Omeprazole is used to reduce stomach acid to treat gastroesophageal reflux as well as conditions such as heartburn, ulcers, belching, and indigestion. See Omeprazole (Oral Route), Mayo Clinic

By the April 26, 2013 visit, Dr. Kelchen recorded that Reinhardt "has been only moderately compliant with the exercises," and "really just wants medication." AR 413. As of April 26, 2013, Dr. Kelchen recorded that "other than her chronic pain, she has no complaints." AR 413.

Reinhardt, on May 25, 2013, was admitted to Avera McKennan Hospital for excruciating left rib pain, apparently from a muscle spasm caused by coughing. AR 426–51. Reinhardt followed up with Dr. Kelchen on June 3, 2013, who described the hospitalization as being one for fear of pneumonia with likely chronic obstructive pulmonary disorder (COPD) and bronchitis. Dr. Kelchen recorded that Reinhardt's "chronic pain in her lower extremities is not noticeable at the present time." AR 510.

As a consequence of Reinhardt's seeking reconsideration of the initial denial of SSI benefits, the Commissioner had a second medical doctor—Thomas Burkhart—do an RFC Assessment on July 5, 2013. Dr. Burkhart's RFC is similar to that of Dr. Whittle. AR 116–18. The end conclusion remained that Reinhardt was not disabled based on an ability to perform past relevant work as a telemarketer. AR 121.

Reinhardt continued to see Dr. Kelchen on a fairly regular basis in 2013. On August 19, 2013, Dr. Kelchen recorded that Reinhardt had experienced an exacerbation of her left knee pain. AR 505–06. Reinhardt went to Sanford Orthopedic & Sports Medicine to see a physician's assistant for left knee pain on August 14, 2013. AR 531–34. After x-rays were taken, the physician's assistant attributed the left knee pain to degenerative joint disease and suggested a series of range-of-motion exercises. AR 534. Dr. Kelchen, on October 8, 2013, talked at length with Reinhardt about her left knee pain and the bone-on-bone arthritis. AR 502–03. Dr. Kelchen described the x-rays as

---

(Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/omeprazole-oral-route/description/drgs-20066836.

[11] Paxil is a brand name for paroxetine, which is prescribed to treat depression, obsessive-compulsive disorder, anxiety disorders, and post-traumatic stress disorder, presumably by increasing serotonin levels in the brain. See Paroxetine (Oral Route), Mayo Clinic (Dec. 1, 2015), http://mayoclinic.org/drugs-supplements/paroxetine-oral-route/description/drg-20067632.

revealing osteoarthritis and a lack of cartilage. AR 504. Reinhardt agreed to be evaluated for possible surgery. AR 502–03.

To be evaluated for possible left knee replacement surgery, Reinhardt saw Dr. Carl Bechtold at Sanford Orthopedic & Sports Medicine on October 31, 2013. AR 536–37. Reinhardt's knee was tender on examination. Dr. Bechtold's impression was severe bone-on-bone degenerative joint disease of the left knee. Dr. Bechtold talked with Reinhardt about the possibility of knee replacement, but also about her risk factors for a poor outcome due to her fibromyalgia, chronic pain, depression, anxiety, obesity, and smoking. AR 537. Dr. Bechtold and Reinhardt discussed use of a cane to help her walk. AR 537. Dr. Bechtold offered to see Reinhardt in the future, AR 537, although there is no record that she followed up with Dr. Bechtold.

In late 2013 and into 2014, Reinhardt continued to see Dr. Kelchen on roughly a monthly basis. AR 540–55. On November 6, 2013, Dr. Kelchen recorded that Reinhardt had resumed smoking and was using a cane whenever her left knee pain flared up. AR 553. At a December 2, 2013 visit, Dr. Kelchen recorded that Reinhardt had a marked increase in low back pain. AR 551. At a January 9, 2014 visit, Dr. Kelchen noted that the left knee was quite a bit better than the prior month. AR 550.

In the record of a February 10, 2014 visit, Dr. Kelchen described having a long discussion with Reinhardt about physical activity and work. Reinhardt at that time was looking for a job to work 15 to 20 hours per week, where she could alternate sitting and standing. AR 547. Dr. Kelchen recorded in his note that Reinhardt felt that "she can function [with] the current level of pain." AR 549. Dr. Kelchen thought that having Reinhardt "get a reasonable job herself and have something [to] occupy her time . . . would be a good thing," and would do the most to help her mood and chronic pain. AR 549.

Reinhardt experienced leg swelling in March of 2014. AR 542–46. At the April 16, 2014 visit, Dr. Kelchen was concerned about Reinhardt's ankle edema and chronic back pain, but noted

9

that she had applied for a job, had a newer car, and should be able to get a job shortly.  AR 540. During the May 15, 2014 visit to Falls Community Health, Reinhardt reported "significant improvement in her mood/anxiety since start of Abilify,"[12] and that "this is the best she has ever felt for some time." AR 538.

Dr. Kelchen's note from June 30, 2014, reads that Reinhardt "states the pain is better this month after being able to walk significantly farther," and was not having swelling in her legs.  AR 604.  During the remainder of 2014, Dr. Jennifer Tinguely updated prescriptions and saw Reinhardt. Reinhardt appeared to have low back and knee pain in July of 2014, and edema in her lower legs in September of 2014.  AR 596; AR 600; AR 602−03.

On November 19, 2014, Dr. Tinguely saw Reinhardt for a physical.  AR 85.  Reinhardt was struggling with pain and asked for an increase in the methadone prescription.  AR 85.  She also reported stress living at home alone and appeared to be depressed.  AR 85.  Dr. Tinguely recorded that Reinhardt had a normal neck exam, had a normal eye exam, and had a normal cardiovascular exam, but was "slow to move" with trouble laying down and getting up.  AR 87.  Dr. Tinguely switched Reinhardt back to Abilify and increased her methadone prescription.  AR 88.  The next day—November 20, 2014—Reinhardt went to Avera McKennan Hospital Emergency Room for what was described as a "straightforward COPD exacerbation, very mild." AR 613.  The medical record described that "the patient is otherwise doing really quite well." AR 613.

The final notes in the Administrative Record are from early 2015.  Dr. Tinguely saw Reinhardt on January 13, 2015.  AR 77–79.  Reinhardt reported worsening pain and was distraught because she had been in a car accident where she slid into a brick wall and was concerned about her

---

[12] Abilify is the brand name for aripiprazole, which is an anti-psychotic agent used to treat mental health conditions such as bipolar disorder, major depressive disorder, and schizophrenia.  See Aripiprazole (Oral Route), Mayo Clinic (Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/aripiprazole-oral-route/description/drg-20066890.

financial ability to pay for fixing the car. AR 77. The remaining notes from early 2015 seem to concern prescriptions only. AR 77.

### C. Reinhardt's Treatment History for Psychological Issues

The earliest record[13] of Reinhardt's psychological treatment is from counselor Ellen Hohm dated September 1, 2009. AR 333. Counselor Hohm assessed Reinhardt as having major depressive disorder, dysthymic disorder, and possible bipolar disorder as a "rule out" diagnosis. AR 333. Hohm foresaw weekly treatment of Reinhardt to alleviate and stabilize Reinhardt's depression and to develop healthy cognitive patterns, among other things. AR 333.

The next record of psychological treatment, nearly two years later, is from counselor Hohm dated July 5, 2011, when Hohm recorded that Reinhardt was presenting with depression, anxiety, and stress. AR 340. Hohm, beginning in early August 2011, saw Reinhardt nearly weekly, although Reinhardt missed some of the weekly meetings. AR 342–48. Reinhardt's son was living with her by September 20, 2011. AR 348. There was then a five-month break in counseling records until February 23, 2012, when Reinhardt visited Hohm with anxiety and extreme stress, reporting that she had nearly been murdered by strangulation three weeks previously. AR 350.

Reinhardt was thereafter treated at the Compass Center, which specializes in assisting those who have been victims of sexual or domestic abuse. AR 318–22. However, Reinhardt was either a no show or cancelled most counseling sessions at the Compass Center in March and April of 2012. The Compass Center ultimately could not complete a description of Reinhardt's current mental functioning when requested to do so. AR 318–22.

Reinhardt returned to counselor Hohm on April 4, 2012, reporting that she could not sleep because she could not shut her brain off and had constant worries. AR 352. On May 30, 2012,

---

[13] The Court is referring to the earliest entry in the administrative record. Reinhardt's attorney supplemented the administrative record with some additional treatment records which this Court has read and incorporated into this Opinion and Order.

11

Reinhardt expressed pride of her son for graduating high school, but was anxious and concerned about her daughter who remained living with the ex-husband. AR 354.

Reinhardt was working with social workers in 2011 and 2012, and some notes from those social workers are in the Administrative Record. AR 474–501. However, the next time Reinhardt saw a mental health professional was July 19, 2012, when Reinhardt began treatment at Southeastern Behavioral Healthcare, initially with psychiatry resident Ammar Ali and then psychiatrist William Fuller. AR 470. On July 19, 2012, Reinhardt told Dr. Ali that her depression was "totally out of control" and that she had struggled with mental health issues from age 18, had chronic sleep problems, and had been diagnosed as being bipolar. AR 470. Reinhardt also described a history of abuse. AR 472. Dr. Ali diagnosed Reinhardt as bipolar not otherwise specified, seeking to rule out ADHD and substance induced mood disorder. AR 472. Dr. Ali's differential diagnosis was major depressive disorder, generalized anxiety disorder, dissociative personality disorder. AR 474. When Reinhardt returned to Dr. Ali and Dr. Fuller on August 9, 2012, the risperidone[14] prescribed to Reinhardt had produced a dramatic change and she was sleeping better. Reinhardt's weight had been down considerably overall, but she reported gaining 20 pounds in the prior two weeks from the risperidone. AR 468. Reinhardt then was prescribed Strattera[15] for ADD. AR 468.

On a Description of Current Mental Functioning form dated August 21, 2012,[16] Dr. Fuller described Reinhardt as having multiple illnesses making almost any job not feasible. AR 464. Dr. Fuller based that opinion at least in part on his understanding of Reinhardt's physical conditions, although there is no indication that he had any records outside of the psychiatric treatment records. See AR 464–65. Dr. Fuller recorded on September 13, 2012, that the Strattera prescription for ADD

---

[14] Risperidone is used to treat mental health conditions including schizophrenia, bipolar disorder, and irritability from autism.   See Risperidone (Oral Route), Mayo Clinic (Jan. 1, 2016), http://mayoclinic.org/drugs-supplements/risperidone-oral-route/description/drg-20067189.

[15] Strattera is a brand name for atomoxetine, which is a selective norepinephrine reuptake inhibitor used to treat ADHD.   See Atomoxetine (Oral Route), Mayo Clinic (Dec. 1, 2015), http://mayoclinic.org/drugs-supplements/atomoxetine-oral-route/description/drg-20066904.

[16] Dr. Fuller for some reason dated his signature September 10, 2011. AR 465.

12

had been discontinued because Reinhardt had headaches. AR 462. Reinhardt at that time was more accepting of doing her home activities, had an improved mood, and was cooperative and pleasant. AR 462.

Reinhardt then appeared to miss a series of appointments scheduled in late 2012 and early 2013 at Southeastern Directions for Life. AR 455–57. During this time, on October 22, 2012, Reinhardt returned to counselor Hohm, who recorded that she had not seen Reinhardt for five months and that Reinhardt finally had a car. AR 356. Counselor Hohm encouraged Reinhardt to come for weekly visits, which Reinhardt said she would do. AR 356; AR 583. Reinhardt next saw counselor Hohm about six weeks later in mid-December of 2012, AR 581, and then continued visiting counselor Hohm into early 2013. AR 577–79. On February 4, 2013, Reinhardt expressed frustration with her physicians over pain medications and acknowledged that she feared physical pain. AR 575. Counselor Hohm believed Reinhardt's chief mental health problem at the time to be major depressive disorder. AR 575. After Reinhardt reported being denied disability benefits on February 18, 2013, Hohm recorded that "it seems this client should have been approved for disability," noting her few resources and struggles with anxiety and depression. AR 573. Reinhardt returned to Southeastern Behavioral Healthcare on November 8, 2012, by which point she had discontinued taking risperidone, associating the drug with her weight gain. AR 458–59.

On December 10, 2012, Reinhardt saw counselor Patricia LaVelle for a mental status examination. AR 373–79. LaVelle recorded that Reinhardt was groomed appropriately, was cooperative, and walked in without aid, although she walked slowly and appeared to be in pain. AR 373. Reinhardt gave her medical history, listed medications that she was taking, spoke of having sleeping issues, and described being depressed "all her life." AR 374. Reinhardt said she had ADD and had been diagnosed with PTSD at the Compass Center. AR 374. Reinhardt described physical violence during her upbringing and domestic violence in a recent relationship, but LaVelle recorded that Reinhardt's "behavior during her narrative did not fit the description." AR 375. Reinhardt gave

13

a confusing account of her legal problems to LaVelle. AR 376. LaVelle recorded that Reinhardt was able to cook for herself, recently started driving again, was of average intelligence, had a mood that was sad and anxious, was low energy, and appeared to have chronic pain. AR 377. According to LaVelle, "ADD was noticeable in her manner" as she had "trouble focusing and had to be redirected." AR 377. LaVelle's diagnostic impression was PTSD, general anxiety disorder with panic attacks, bipolar disorder II, ADD, and possibly borderline and histrionic features. AR 378. LaVelle recommended continued counseling. AR 378.

Dr. S. Richard Gunn, on January 22, 2013, created a mental RFC for Reinhardt. AR 99–101. Dr. Gunn thought Reinhardt to have no understanding and memory limits, but sustained concentration and persistence limits. AR 99. Dr. Gunn believed that Reinhardt could carry out very short and simple instructions. AR 99. Dr. Gunn thought Reinhardt was moderately limited on carrying out detailed instructions, and maintaining attention and concentration for extended periods of time. AR 100.

Reinhardt last saw Dr. Ali on April 18, 2013, when Dr. Ali's impression of Reinhardt was bipolar disorder NOS and a history of ADD. AR 452. Reinhardt recently had lost Medicaid coverage with her son turning 18. AR 453. Dr. Ali discussed medication choices and recorded that she was applying for disability and was having her methadone prescription levels decreased. AR 453.

Upon her request for reconsideration of the denial of SSI benefits, the Commissioner had a second mental RFC done of Reinhardt. On July 1, 2013, Doug Soule, Ph.D., produced a mental RFC that was similar to Dr. Gunn's prior mental RFC. AR 118–19. The result of the mental RFC remained that Reinhardt was not disabled based on her ability to perform past relevant work as a telemarketer. AR 120–21.

After a three-month break from treatment with counselor Hohm, Reinhardt returned to see Hohm on June 28, 2013. AR 569. Reinhardt continued to struggle with increased depression during monthly meetings with Hohm in June, July, and August of 2013. AR 565–69.

Reinhardt scheduled and missed some appointments at Southeastern Directions for Life with Dr. Bob Nuss in September of 2013. AR 527. She ultimately saw Dr. Nuss for the first time on October 28, 2013. AR 517–18. Reinhardt reported to Dr. Nuss having sleeping issues, chronic pain, decreased energy, and needing assistance in her activities of daily living from her son. AR 517. She walked with a cane, had normal language skills, and displayed an anxious mood. AR 518.

The final three visits in the record between Reinhardt and counselor Hohm are from November 25, 2013, June 10, 2014, and July 23, 2014. During these visits, Reinhardt continued to struggle with anxiety, depression, extreme stress and physical pain. AR 559–63. Reinhardt saw counselor Sarah Thoms on November 25, 2014. AR 83–84. She had scheduled additional counseling sessions with Thoms in December of 2014, but missed those. AR 79. She again was a no show for counseling with Thoms in January of 2015. AR 77. No further records of Reinhardt's mental health treatment or counseling exist in the Administrative Record.

### D. Testimony During Evidentiary Hearing

The ALJ conducted an evidentiary hearing on June 12, 2014. AR 31. Reinhardt appeared with her attorney. AR 33–35. The ALJ clarified through questioning that Reinhardt had changed her date of alleged onset of disability from May 15, 1995 to July 31, 2012. AR 36.

Reinhardt testified to using a cane and a walker in order to ambulate. AR 39. She had completed some college. AR 40. Although she testified that her hands cramp when writing too much, she acknowledged that she maintains a checkbook and keeps track of bills. AR 40. Reinhardt

testified that she last worked in 2013,[17] when she cleaned offices for something less than three months' time. AR 41. She quit the position because she was not strong enough. AR 41.

Reinhardt testified to severe limitations, such as not being able to dress herself or bend down to put on her shoes or socks, although she did bathe herself. AR 42. Reinhardt testified that she drives, but spends no more than 20 minutes at a time maximum behind the wheel. AR 43. The hobbies she listed included working on a computer and watching television. AR 43. She attributed her disability due to excruciating left knee pain that prevented her from standing, and depression, together with COPD, being overweight, arthritis, and low back pain. AR 45–46. Reinhardt identified Dr. Kelchen as her primary care physician and psychologist Hohm as treating her mental health issues. AR 47–49.

Reinhardt did not have problems getting along with others and had a social circle of her neighbors. AR 50–51. Reinhardt testified to concentration problems, but said that she read medical, self-help, and daily affirmation books, and used the internet to look up things and to receive and send emails. AR 51–53. Reinhardt testified to severe limitations in lifting, walking, sitting, and dexterity. AR 54–57; AR 59.

James Miller testified as a vocational expert at the evidentiary hearing. AR 61. When asked hypothetical questions about limitations described in the physical and mental RFCs in the Administrative Record, Miller said that such a person could work as a telephone solicitor. AR 63–64. The telephone solicitor position is sedentary. AR 65. When asked a final question more closely in line with what Reinhardt had described as her limitations, Miller said that such a person could not do the telephone solicitor work full-time. AR 65.

---

[17] If Reinhardt's date is accurate, she worked for three months' time after her alleged disability onset date.

### E.  ALJ's Decision

The ALJ issued a decision denying Reinhardt's application for SSI benefits.  AR 11–24.  In doing so, the ALJ used the sequential five-step evaluation process in 20 C.F.R. §§ 404.1520(a) and 416.920(a).  Under the "'familiar five-step process' to determine whether an individual is disabled, . . . [t]he ALJ 'consider[s] whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.'"  Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)) (alteration in original); see also 20 C.F.R. § 416.920(a) (detailing the five-step process used in evaluating claims for SSI).

At the first step, the ALJ determined that Reinhardt had engaged in no substantial gainful activity since July 31, 2012, Reinhardt's alleged date of disability.  AR 13.  The ALJ did not mention Reinhardt's testimony at the hearing that she had worked in 2013 for "not quite three months" cleaning offices.  See AR 41.

At step two, the ALJ concluded that Reinhardt's severe impairments included degenerative joint disease in her left knee, carpal tunnel of the left hand, residual carpal tunnel in the right hand post release, fibromyalgia, obesity, COPD, anxiety disorder, and bipolar disorder.  AR 13.  The inclusion of carpal tunnel issues appears to have been a bit generous to Reinhardt in that there is no medical evidence in the record about recent treatment for or limitations associated with carpal tunnel or residual carpal tunnel.  The ALJ reviewed other reported problems, but did not mention either ADD or ADHD among the severe impairments.  See AR 13.

At step three, the ALJ determined that Reinhardt's severe impairments do not singly or in combination meet any of the listed impairments.  AR 14–16.  The ALJ then determined that Reinhardt had the residual functional capacity to perform sedentary work with a sit/stand option, such that she could alternate 30 minutes of sitting with 5 minutes of standing and deal with other

17

limitations. AR 16–17. The ALJ then considered at greater length the effect of Reinhardt's severe impairments on her functioning, including discussion of fibromyalgia and certain credibility issues. AR 18–20. The ALJ deemed Reinhardt's limitations on some activities of daily living "to be more self-imposed than actually precluded by her impairments." AR 21. The ALJ discussed the psychologists' reports, including mention of ADD. AR 21–22. The ALJ concluded that there were no findings consistent with ADD and that Reinhardt did not have apparent memory or attention problems. AR 21–22. The ALJ discussed that her treating physician, Dr. Kelchen, thought that Reinhardt should seek out work, and that the consulting examiner, Dr. List, believed that Reinhardt could do sedentary work. AR 22–23. The ALJ noted that the vocational expert believed that a person of Reinhardt's limitations could work as a telemarketer. AR 24. Accordingly, the ALJ found that Reinhardt was not disabled because she was capable of performing her past relevant work as a telemarketer. AR 24.

### III.   Standard of Review

When considering whether the Commissioner properly denied social security benefits, a court must "determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole." Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (quoting Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000)); see also Nowling v. Colvin, 813 F.3d 1110, 1119–20 (8th Cir. 2016). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law," and such errors are reviewed de novo. Collins, 648 F.3d at 871 (internal citations removed).

The Commissioner's decision must be supported by substantial evidence in the record as a whole. Evans v. Shalala, 21 F.3d 832, 833 (8th Cir. 1994); see Nowling, 813 F.3d at 1119; Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016). "Substantial evidence is more than a mere scintilla," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), but "less than a preponderance," Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006) (quoting McKinney v. Apfel, 228 F.3d 860,

18

863 (8th Cir. 2000)); see also Nowling, 813 F.3d at 1119. It is that which "a reasonable mind would find adequate to support the Commissioner's conclusion." Miller v. Colvin, 784 F.3d 472, 477 (8th Cir. 2015) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord Nowling, 813 F.3d at 1119; Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998); Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996). The "'substantial evidence in the record as a whole' standard is not synonymous with the less rigorous 'substantial evidence' standard." Burress, 141 F.3d at 878. "'Substantial evidence on the record as a whole' . . . requires a more scrutinizing analysis." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

A reviewing court must "consider evidence that supports the [Commissioner's] decision along with evidence that detracts from it." Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995); see also Nowling, 813 F.3d at 1119. In doing so, the court may not make its own findings of fact, but must treat the Commissioner's findings that are supported by substantial evidence as conclusive. 42 U.S.C. § 405(g); see also Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987) (noting that reviewing courts are "governed by the general principle that questions of fact, including the credibility of a claimant's subjective testimony, are primarily for the [Commissioner] to decide, not the courts"). "If, after undertaking this review, [the court] determine[s] that 'it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings, [the court] must affirm the decision' of the [Commissioner]." Siemers, 47 F.3d at 301 (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)); see also Chaney, 812 F.3d at 676. The court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." Miller, 784 F.3d at 474 (citing Blackburn v. Colvin, 761 F.3d 853, 858 (8th Cir. 2014)); see also Nowling, 813 F.3d at 1119.

## IV.   Discussion

Reinhardt argues that the ALJ's decision, and in turn the Commissioner's decision, is not

supported by substantial evidence on the record as a whole and is not free from legal error.

Reinhardt raises four issues on appeal:

I.     Whether the Commissioner failed to properly evaluate [Reinhardt's] severe fibromyalgia impairment?

II.    Whether the Commissioner failed to properly identify and incorporate [Reinhardt's] attention deficit disorder in her residual functional capacity?

III.   Whether the Commissioner's determination of [Reinhardt's] residual functional capacity is supported by substantial evidence?

IV.    Whether the Commissioner erred in evaluating the opinions of [Reinhardt's] treating provider and consulting examiners?

Doc. 14 at 1. The Court addresses each of those four arguments in turn.

### A. Evaluation of Reinhardt's Fibromyalgia Impairment

Reinhardt's first argument is that the ALJ failed to follow Social Security Ruling 12-2p in

evaluating Reinhardt's fibromyalgia. See Social Security Ruling 12–2p: Evaluation of Fibromyalgia,

77 Fed. Reg. 43,640 (July 25, 2012) (setting forth the policy interpretation ruling of the Social

Security Administration on the evaluation of fibromyalgia claims for SSI cases) (hereinafter SSR 12-

2p).  Reinhardt points out that SSR 12-2p calls for evaluation of fibromyalgia based on criteria

including widespread pain, positive tender points upon exam, and exclusion of other causes. Doc. 14

at 31.  Reinhardt notes that SSR 12-2p defines fibromyalgia symptoms, signs and co-occurring

conditions to include "fatigue, cognitive memory problems or fibro fog, waking unrefreshed,

depression, anxiety disorder, irritable bowel syndrome, irritable bladder syndrome, interstitial

cystitis, TMJ disorder, reflux disorder, migraines, and restless leg syndrome." Doc. 14 at 31; see also

SSR 12-2p, 77 Fed. Reg. at 43,642 & n.9–10.  Reinhardt does not argue that her fibromyalgia or

other conditions meet any listing, singly or in combination.  See Doc. 14 at 30–34.  Rather,

Reinhardt's argument appears to be that it is per se error for the ALJ not to refer to SSR 12-2p, and

that the ALJ insufficiently evaluated fibromyalgia when determining Reinhardt's RFC. See Doc. 14 at 32 (twice mentioning RFC in connection with the argument about failure to apply SSR 12-2p).

Reinhardt argues, based on Hajek v. Shalala, 30 F.3d 89 (8th Cir. 1994), that the ALJ's failure to consider and properly apply SSR 12-2p is an abuse of discretion. Doc. 14 at 31; see Hajek, 30 F.3d at 92.[18] In Hajek, the United States Court of Appeals for the Eighth Circuit reversed and remanded a denial of benefits because the ALJ had concluded that the claimant could perform his past relevant work as a janitor (a medium exertional requirement job) despite the fact that his walking limitations precluded him from medium exertional requirements as defined by SSR 83-10. Id. at 92. The Eighth Circuit stated, "This ruling [SSR 83-10] is as binding on the [Commissioner] as the regulation on which it is based." Id. (citing Carter v. Sullivan, 909 F.2d 1201, 1202 (8th Cir. 1990)); see also Grebenick v. Chater, 121 F.3d 1193, 1200 (8th Cir. 1997). If the ALJ's evaluation of Reinhardt's fibromyalgia conflicts with SSR 12-2p, then reversal and remand would be justified.

Much of SSR 12-2p concerns how to evaluate whether a fibromyalgia claim is a medically determinable impairment. Here, the ALJ in step two recognized fibromyalgia as one of Reinhardt's severe impairments. AR 13. The ALJ then mentioned Reinhardt's fibromyalgia as a factor for why she was not a good candidate for left knee surgery. AR 20. The ALJ believed that fibromyalgia restricted her from reaching overhead and, in combination with the knee issues, from certain mobility. AR 20. The ALJ drew information from Reinhardt's treating physician, Dr. Kelchen, and from the state examining physician, Dr. List, in evaluating Reinhardt's RFC. AR 22–23. The ALJ

---

[18] The Commissioner's brief dismissively responds in one sentence to this argument: "Plaintiff notes the ALJ did not mention SSR 12-2p, but fails to cite any authority suggesting that an ALJ must mention SSR 12-2p when evaluating fibromyalgia. Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1991) (failure to cite regulation for non-severe impairment harmless where opinion shows that ALJ applied correct standard)." Doc. 17 at 4–5. The Henderson case does not stand for the proposition cited by the Commissioner, dealing instead with legal standards, not the citation of SSI regulations or rulings. Although Hajek does not explicitly deal with SSR 12-2p and fibromyalgia, it does stand for the proposition that an SSR is binding and failure to consider an SSR may be abuse of discretion. See Hajek, 30 F.3d at 92.

also discussed Reinhardt's "good pain relief with the use of narcotic pain relievers" and her history of being prescribed methadone and other drugs to deal with the fibromyalgia. AR 20.

The ALJ did not cite to or mention SSR 12-2p in evaluating Reinhardt's fibromyalgia. However, an ALJ's mere failure to cite a pertinent regulation is not per se grounds for reversal or remand when the ALJ's analysis is consistent with the regulation. See Henderson v. Colvin, No. C15-0081-CJW, 2016 WL 4599920, at *17 (N.D. Iowa Sept. 2, 2016) (finding no error where the ALJ complied with the substance of an SSR, but failed to explicitly reference the SSR); Allen v. Sullivan, 977 F.2d 385, 390 (7th Cir. 1992) (distinguishing a case where the ALJ was unaware of an SSR and failed to follow its guidelines entirely). Here, the ALJ's discussion of fibromyalgia is not inconsistent with SSR 12-2p. The ALJ did refer to certain symptoms discussed in SSR 12-2p, such as Reinhardt's widespread pain, but not to other fibromyalgia symptoms Reinhardt did not exhibit. See AR 18–20. For example, the ALJ did not reference positive tender points upon exam, but there is little evidence in the record of such positive tender points on exam of Reinhardt. See SSR 12-2p, 77 Fed. Reg. at 43,6432. Similarly, the ALJ did not discuss irritable bladder syndrome, interstitial cystitis, and TMJ disorder because they did not apply at all to Reinhardt. See id. at 43,6432 n.9–10. Other fibromyalgia factors listed in SSR 12-2p do find their way into the ALJ's decision. See AR 18–20.

The ALJ's analysis was not inconsistent with the substance of SSR 12-2p. SSR 12-2p in its introduction contemplates a need for objective medical evidence by stating:

> As with any claim for disability benefits, before we find that a person with [fibromyalgia] is disabled, we must insure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that precludes him or her from performing any substantial gainful activity.

SSR 12-2p, 77 Fed. Reg. at 43,641. When evaluating the intensity and persistence of the claimant's pain or other symptoms, the Commissioner is to determine first whether objective medical evidence "substantiate[s] the person's statements about the intensity, persistence, and functionally limiting

effects of symptoms." Id. at 43,643. If the evidence does not support the claimant's allegations, the agency is to consider all relevant evidence and make "a finding about the credibility of the person's statements regarding the effects of his or her symptoms on functioning." Id. This evidence is to include "the person's daily activities, medications or other treatment the person uses" and similar factors. Id.

SSR 12-2p explicitly outlines the five-step sequential evaluation process to determine whether a person with a medically determined impairment of fibromyalgia is disabled. Id. at 43,643–44. The ALJ considered all such matters and applied the five-step process. AR 11−24. SSR 12-2p discusses somewhat briefly the RFC assessment in a fibromyalgia case, but reaffirms that "[i]f the person is able to do any past relevant work, we find that he or she is not disabled." SSR 12-2p, 77 Fed. Reg. at 43,644. In short, SSR 12-2p, when read in full, does not countermand the approach that the ALJ took here. The reasons why the RFC is supported by substantial evidence are discussed further in Part C below. In brief, the failure of the ALJ to cite, discuss, or rely upon SSR 12-2p in evaluating Reinhardt's fibromyalgia is not a reason for reversal or remand under these circumstances.

### B. Attention Deficit Disorder Effect on the RFC

Reinhardt next argues that the Commissioner failed to properly identify and incorporate Reinhardt's attention deficit disorder in her RFC. Doc. 14 at 34–37. The ALJ in fact did not include ADD or ADHD in listing Reinhardt's severe impairments in step two. AR 13. The ALJ, however, noted that Reinhardt had reported memory and concentration issues, among other issues, AR 18, and discussed that ADD had been listed among Reinhardt's psychological or psychiatric issues, AR 21. The ALJ then reasoned:

> While the undersigned accepts the diagnoses for bipolar disorder and a generalized anxiety disorder, there are no other findings consistent with ADD within the medical evidence of record. The claimant had alleged these issues to treatment providers and had been given medications which generally treat it, but there were no findings documenting the impairment. The claimant's ability to maintain concentration to read medical and self-help books, in addition to watching television, do not reflect a problem with understanding or remembering instructions. Her alleged memory

23

problems are simply inconsistent with findings from treatment providers which suggest she has good attention and concentration. On the whole, Dr. Sandbulte's[19] opinion is at odds with the suggestion from her treating physician, Phillip Kelchen, M.D., that she should seek employment.

AR 21–22.

There is inconsistency in the psychological records about whether Reinhardt has ADD or ADHD. Counselor LaVelle described in a report co-signed by Dr. Sandbulte that ADD was noticeable in her manner with trouble focusing, but only saw Reinhardt on one occasion. AR 377–78. Other counselors listed psychological or psychiatric issues without mentioning ADD or ADHD, including counselor Hohm, whom Reinhardt saw the most. See AR 331–32. Dr. Ali diagnosed various psychological and psychiatric issues, but was hesitant on ADD or ADHD, noting "rule out ADHD" despite Reinhardt reporting to him a past diagnosis of ADD or ADHD. AR 472. Dr. Nuss did not mention ADD in his evaluation of Reinhardt. AR 517–19. At times, mental status examinations of Reinhardt specifically noted that her attention and concentration were good or fair. AR 453; AR 459; AR 472; AR 518. As the ALJ noted, "progress notes from Southeastern Direction show that she has good attention and concentration." AR 20–21. Reinhardt, to be sure, has made various statements that she has memory and concentration issues. However, she has said that her ability to pay attention "depends on day & pain level," indicating that maybe her pain causes part of her attention problems. AR 253. When asked about her problems with concentration at the administrative hearing, Reinhardt responded "I have a problem with my memory. I'm not sure if that's so much concentrating." AR 51.

The ALJ, despite not finding ADD or ADHD among her severe impairments, discussed and considered Reinhardt's possible ADD in assessing her RFC. AR 21–22. Thus, the failure to identify Reinhardt's possible ADD in step two, if error at all, was harmless, as the ALJ continued to consider

[19] The ALJ was referring to a report authored by counselor LaVelle and co-signed by Shelley Sandbulte, Ed.D. AR 379.

24

the ADD in the context of the RFC.[20]  Cf Toye v. Astrue, No. C11-3035-MWB, 2012 WL 1969224,
at *10 (N.D. Iowa June 1, 2012).  Although the ALJ could have weighed the evidence differently on
ADD, this Court is to determine whether "substantial evidence in the record as a whole" supports the
ALJ's determination.  Collins, 648 F.3d at 871; Evans, 21 F.3d at 833.  This Court cannot conclude
that there is an absence of substantial evidence supporting how the ALJ regarded and considered
Reinhardt's possible ADD.

### C. Whether the RFC is Supported by Substantial Evidence

#### 1. Physical RFC

Reinhardt's primary argument that the ALJ erred in determining her physical RFC was the
absence of discussion about her severe carpal tunnel impairment in the left hand, and residual carpal
tunnel syndrome in the right hand post release.  Doc. 14 at 38–41.  First, it was charitable for the ALJ
to determine that carpal tunnel of the left hand and residual carpal tunnel of the right hand were
severe impairments in step two.  AR 13.  The medical records are nearly silent as to any ongoing
carpal tunnel issues suffered by Reinhardt.  The only record evidence of carpal tunnel, other than
Reinhardt's reports of having past problems, are her mentions of left-sided carpal tunnel issues to Dr.
Kelchen in October and November of 2013.  AR 552–55.  Dr. Kelchen referenced a prior EMG,
"which shows moderate carpal tunnel."  AR 554.  The ALJ was mindful of these records and
observed that, despite the findings of pins and needles and a positive Tinel's sign in the left hand,
Reinhardt's grip strength was reduced only to four-and-a-half out of five, and that most of her
problems occurred while she was sleeping.  AR 19 (citing AR 551–55).  The ALJ therefore
concluded that her carpal tunnel syndrome limited her to frequent handling and fingering, and limited
her lifting at a sedentary level.  AR 19.  The physical RFC used by the ALJ is consistent with
substantial evidence in the record as a whole, and consistent with Reinhardt's own treating

---

[20] If Reinhardt has ADD or ADHD, that condition presumably is longstanding and existed during
times before July 2012, when she was able to work in telemarketing and other jobs.

physician's view that she could work and would experience health benefits from getting a job.  AR 549.

### 2.  Mental RFC

Reinhardt's main criticism of the ALJ's determination of her mental RFC is elevating the state agency expert Dr. Soule's assessment at the reconsideration level over that of other providers. Doc. 14 at 42–45.  This is a closer issue than concerns the physical RFC.  After all, there are treating mental health providers—Dr. Fuller and counselor Hohm—who opined that Reinhardt was incapable of gainful employment due to her physical and psychological problems.  Neither, however, did a record review of her physical problems, and both were relying upon the accuracy of Reinhardt's reports of physical problems.  As to those who conducted physical examinations of Reinhardt, both her treating physician Dr. Kelchen and the state examining physician Dr. List opine that she was able to work, although with limitations.  This is consistent with the physical RFC.  Thus, if Reinhardt is disabled, it would be based primarily on psychological issues.

A claimant's RFC "is defined as the most a claimant can still do despite his or her physical or mental limitations."  Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (quoting Leckenby v. Astrue, 487 F.3d 626, 631 n.5 (8th Cir. 2007)).  "Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007).  "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).

The Eighth Circuit has reversed when an ALJ relied exclusively on "opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of [the claimant's] RFC."  Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  In doing so, the Eighth Circuit observed that opinions of doctors "who have not examined the claimant ordinarily do not

26

constitute substantial evidence on the record as whole." Id. Unlike in Nevland, however, the ALJ, while drawing from a non-treating, non-examining physician's mental RFC, did not base the decision of her mental RFC solely on that information. AR 21–23.

The examining psychologist in developing the mental RFC recognized that Reinhardt has psychological issues and limitations. AR 99–101; AR 118–19. The ALJ examined the record as a whole and discussed this in his findings. The ALJ specifically addressed and discounted Dr. Fuller's opinion, because it was "based in part upon her physical impairments for which he has provided no treatment and are outside of his area of expertise." AR 21. The ALJ deemed Dr. Fuller's opinion to be "quite conclusory and it sets forth no specific limitations related to her mental impairments which impact her ability to work." AR 21. These statements by the ALJ are supported by the record. See AR 99–100; AR 118–21; AR 464–65; see also Hamman v. Berryhill, No. 16-1216, slip op. at 3 (8th Cir. Feb. 24, 2017) (per curiam) (finding no reversible error where the ALJ discounted a treating physician's assessment because "the majority of his assessment consisted of checked boxes and conclusory statements" and record supported the ALJ's differing assessment). Dr. Fuller appeared to have seen Reinhardt just once prior to completing the form supplying his opinions, and appears to have relied exclusively on Reinhardt's own reports of physical issues. See AR 464–65. Dr. Kelchen, who prescribed antipsychotic medications for Reinhardt's mental health issues and treated her over many months for physical issues, was of the opinion that Reinhardt could and should work, and indeed that her mental health would improve if she were to work. AR 423–24; AR 548–49. The ALJ relied on not just Dr. Soule's mental RFC, but also on Dr. Kelchen's opinion in assessing Reinhardt's psychological issues and mental RFC. AR 20–24. This case presents an instance where substantial evidence in the record as a whole would support either conclusion—that Reinhardt has or does not have a mental RFC that allows sedentary work as a telemarketer. In such a situation, this Court is to affirm the ALJ. Blackburn, 761 F.3d at 858.

### D. Alleged Error in Evaluating Certain Opinions

Finally, and related to the argument on the mental RFC, Reinhardt argues that the ALJ failed to afford proper and controlling weight to opinions of Reinhardt's treating physicians. Doc. 14 at 44–47. The Commissioner is to give controlling weight to the findings of the treating physician on the severity of an impairment, if those findings are well supported by medically accepted clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); Reed v. Barnhart, 399 F.3d 917, 920–21 (8th Cir. 2005). An ALJ must "always give good reasons" for the weight afforded to a treating physician's evaluation. Reed, 399 F.3d at 921 (citing 20 C.F.R. § 404.1527(c)(2)). If controlling weight is not given to the opinions of treating physicians, deference must still be granted, with weighing of the factors set forth in 20 C.F.R. § 404.1527. See Social Security Ruling 96–2p: Giving Controlling Weight to Treating Source Medical Opinions, 61 Fed. Reg. 34,490 (July 2, 1996). However, a treating physician's opinion is not automatically controlling, Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014), and the ALJ is to resolve conflicts among various treating and examining physicians, Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007). An ALJ may disregard or discount a treating physician's opinion if medical evidence supports a different conclusion, or if the treating physician renders inconsistent opinions that undermine the credibility of the opinion. Smith, 756 F.3d at 627. In evaluating a treating physician's opinions, the ALJ is to consider factors such as the examining relationship, treatment relationship, length of treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency with the record as a whole, specialization, and other relevant factors. 20 C.F.R § 416.927(c)(1)–(6).

Reinhardt argues that the ALJ failed to give proper weight to the opinions of Dr. Fuller. Doc. 14 at 44. In discussing the opinions of Dr. Fuller, the ALJ stated:

> As for the opinion evidence, the undersigned considered the opinions of William Fuller, D.O. from September of 2011. He opined that the claimant's multiple illnesses "make almost any job not feasible because of her physical pain & mood &

behavioral problems concurrently." His opinion, however, is based in part upon her physical impairments for which he has provided no treatment and are outside of his area of expertise. Little weight has been given to his assessment for that reason. Additionally, Dr. Fuller's opinion is quite conclusory and it sets forth no specific limitations related to her mental impairments which impact her ability to work.

AR 21 (citations omitted). Dr. Fuller was practicing at Southeastern Directions for Life at the time he expressed that opinion. Dr. Fuller had apparently seen Reinhardt for the first time on August 9, 2012, and was seeing Reinhardt for the second time when he expressed the opinions in question in September 2012. AR 464−69. Reinhardt previously had been seeing Dr. Ali, who apparently was a resident at the time, and Dr. Ali expressed no opinion, either way, about Reinhardt's employability. Dr. Fuller had provided no treatment for Reinhardt's physical conditions at all, nor did he apparently conduct any record review in expressing his opinion.

The ALJ also discounted the opinion of a state examining psychologist and explained why Reinhardt's global assessment of function (GAF) scores were given little weight. AR 21−22. The ALJ chose to give great weight to the state agency psychological consultant and to the opinion of Reinhardt's treating family practice doctor, who had treated Reinhardt on a number of occasions—including prescribing medications to address Reinhardt's psychiatric issues. AR 22. That family practice doctor, Dr. Kelchen, opined that Reinhardt ought to be working and recorded that she was looking for a job in February of 2014 that would be 15 to 20 hours per week where she could alternate standing and sitting in a way she could tolerate. AR 22; AR 547. The ALJ's determination that the psychological opinions were inconsistent with Dr. Kelchen's opinion is sensible, especially given that Dr. Kelchen not only was aware of Reinhart's psychological issues but also had treated them through prescriptions. AR 422−23. Again, this is a point where the evidence pointed in opposite directions and where the ALJ could have decided the matter either way. However, substantial evidence in the record as a whole exists for the manner in which the ALJ decided to discount Dr. Fuller and the other opinions in favor of the opinion of Dr. Kelchen and Dr. Soule's mental RFC. See Blackburn, 761 F.3d at 858.

V.      **Conclusion and Order**

For the reasons explained above, it is hereby

ORDERED that the Commissioner's decision is affirmed.

DATED this _1st_ day of March, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE